IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



| | |
|---|---|
| CHOOSE LIFE ILLINOIS, INC., an Illinois not-for-profit corporation, RICHARD BERGQUIST, SUE BERGQUIST, JAMES FINNEGAN, PHYLLIS FINNEGAN, DANIEL GURA, SANDRA GURA, BECKY MacDOUGALL, VIRGINIA McCASKEY, THOMAS MORRISON, BETHANY MORRISON, DAN PROFT, RICHARD STANEK, JILL STANEK, JOSEPH J. WALSH, and CAROL WALSH, individuals, <br><br>Plaintiffs, <br><br>vs. <br><br>JESSE WHITE, an individual, sued in his official capacity as the Secretary of State of the State of Illinois, <br><br>Defendant. | NO. 04 C 4316 <br>Judge David Coar |

FILED
KC
DEC 07 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## NOTICE OF FILING

To: See Attached Service List

    Please take notice that on Wednesday, December 7, 2005, the undersigned counsel for Plaintiffs, Choose Life Illinois, Inc., an Illinois not-for-profit corporation, et. al., has caused to be filed with the Clerk of the above Court, Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, a copy of which is served on you herewith.

                                                                    One of the attorneys for Plaintiffs

Of Counsel:
Thomas Brejcha
Christopher Henning
Thomas More Society
29 South LaSalle Street - Suite 440
Chicago, Illinois 60603
Tel. 312-782-1680

Fax 312-782-1887

Alan Untereiner
Damon Taafe
Robbins, Russell, Englert,
  Orseck & Untereiner
1801 K Street
Washington, D.C. 20006
Tel. 202-775-4500
Fax 202-775-4510

## CERTIFICATE OF SERVICE

Christopher Henning hereby certifies that he caused copies of the foregoing Notice of Filing, together with the document referred to therein, to be served on the parties identified in the Service List attached hereto, by the means set forth therein, this 7th day of December, 2005.

## SERVICE LIST

| Person Served | Method of Service |
|---|---|
| Thomas Ioppolo<br>Assistant Attorney General<br>100 W. Randolph Street<br>13th Floor<br>Chicago, Illinois 60601 | Personal Delivery ___<br>Telefax Delivery ___<br>Fedex Overnight Delivery ___<br>First Class Mail ✗ |



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHOOSE LIFE ILLINOIS, INC., et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| JESSE WHITE, Secretary of State, State of Illinois, | ) ) ) ) |
| Defendant. | ) |

No. 04 C 4316
Judge Coar

KC FILED
DEC 0 7 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Thomas Brejcha
Christopher Henning
THOMAS MORE SOCIETY
29 South LaSalle Street, Suite 440
Chicago, IL 60603
Tel.: (312) 782-1680
Fax: (312) 782-1887

Alan Untereiner
Damon Taaffe
ROBBINS, RUSSELL, ENGLERT,
   ORSECK & UNTEREINER LLP
1801 K Street, N.W., Ste. 411
Washington, D.C. 20006
Tel.: (202) 775-4500
Fax: (202) 775-4510

*Attorneys for Plaintiff Choose Life, Inc., et al.*

### MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs Choose Life Illinois, Inc. ("Choose Life") *et al.* respectfully submit this memorandum of law in opposition to Defendant Jesse White's motion for summary judgment. Notwithstanding his earlier admission that specialty plates contain private speech, Secretary White now argues that they constitute pure governmental speech, and that the State may therefore decline to offer a specialty plate that communicates a message with which the State disagrees. He also argues that the individual plaintiffs lack standing because "the applicant for the Choose Life plate is the organization, not the individual motorists" (Br. 11), and that the Tax Injunction Act precludes our requested alternative remedy of enjoining the operation of the specialty plate program. None of those contentions withstands scrutiny.

### I. THERE IS NO STATUTORY REQUIREMENT THAT THE GENERAL ASSEMBLY APPROVE EACH SPECIALTY PLATE BEFORE IT ISSUES

Much of the Secretary's position is premised on a faulty assumption. At the very outset of his brief, he states that "the legislature *must* pass a law authorizing the specific plate. The Secretary of State cannot simply issue a plate without statutory authority." Br. 1 (emphasis added). His contention that the legislature must authorize specific plates is his way of stating that he lacks authority to grant plaintiffs the relief they seek, *i.e.*, the creation of a Choose Life plate. See Br. 2 ("Choose Life Illinois and a number of individuals have lobbied the Illinois General Assembly for a 'Choose Life' license plate. To date they have not been successful."). But whatever his theory, the underlying assertion is simply false – *no statute* requires that the General Assembly authorize a specific plate before the Secretary can issue it. Only the Secretary's own policy creates that precondition.

In Illinois, the Secretary of State has statutory responsibility for issuing vehicle license plates and for administering the specialty license plate program. SUF ¶ 3. The statute governing the specialty plate program provides only that the Secretary is barred from issuing a series of special plates "unless applications, as prescribed by the Secretary, have been received for 10,000 plates of that series; except that the Secretary of State may prescribe some other required number of applications if that number is sufficient to pay for the total cost of designing, manufacturing,

and issuing the special license plate." 625 ILCS 5/3-600(a); Plaintiffs' Statement of Uncontested Facts ¶ 16. In other words, the Secretary may design the application forms and may set the required number of pledges. Nowhere does the governing statute mention legislative approval of each specialty plate. Indeed, by enacting 625 ILCS 5/3-600(a), the General Assembly has *already* approved the issuance of any plate that receives the number of applications that the Secretary prescribes. And the Secretary is empowered to issue specialty plates even absent 625 ILCS 5/3-600(a) – that statute was enacted in 1990 (SUF ¶ 12), but specialty plates were issued as early as 1983. *Id.* ¶ 10.

Thus, when the Secretary states that "the legislature must pass a law authorizing the specific plate," and that he "cannot simply issue a plate without statutory authorization," he refers only to limitations *of his own creation*. The only reason that he "cannot" issue any plate that receives 850 signatures is because he says he can't – in a policy document he is entirely free to change.

## II. AS DEFENDANT PREVIOUSLY CONCEDED, SPECIALTY PLATES CONTAIN PRIVATE SPEECH

As we explained in detail in our Motion for Summary Judgment (at 3-8), virtually every court to consider the question has concluded that specialty plates contain private speech. See, e.g., *Sons of Confederate Veterans, Inc. v. Commissioner of Virginia Dep't of Motor Vehicles*, 288 F.3d 610, (4th Cir. 2002) ("*SCV*"); *Planned Parenthood of South Carolina v. Rose*, 361 F.3d 786 (4th Cir. 2003); *Henderson v. Stalder*, 265 F. Supp. 2d 699 (E.D. La. 2003), *rev'd on other grounds*, 407 F.3d 351 (5th Cir. 2005); *ACLU v. Bredesen*, 354 F. Supp. 2d 770 (M.D. Tenn. 2004); *Women's Resource Network v. Gourley*, 305 F. Supp. 2d 1145, 1161 (E.D. Ca. 2004). Indeed, Defendant himself previously conceded that specialty plates contain private speech, acknowledging that the "literal speaker" includes the driver who seeks to display a specialty plate (Mot. Dis. 12), and that, "[f]or every specialty plate, there are two speakers." *Id.* at 14. His concession was eminently reasonable in light of the specialty plate program's official promotional materials, which trumpet the degree to which those plates promote the expression of a driver's private values. For example, the brochure for the "Pet Friendly" plate states that it "provide[s] a great way to *show your love* of animals and *even say something special* about your

pet." SUF ¶ 35 (emphasis added).

Despite this overwhelming line of precedents and his own prior concession, the Secretary now turns on a dime and suggests – albeit tepidly – that specialty plates contain pure governmental speech after all. See Br. 8 ("The [*SCV*] four-part test clearly leads to the conclusion special license plates are a form of governmental speech."); *id.* at 3 ("The State is the speaker."); *id.* at 9 ("The identity of 'the literal speaker' is the State."). Defendant should be held to his prior concession. Indeed, it speaks volumes that the strongest precedents he has mustered are *dissents from denials of rehearing* in cases holding that specialty plates contain private speech. See Br. 6 (Judge Niemeyer's dissent from denial of rehearing in *SCV*); Br. 7 (Judge Shedd's dissent from denial of rehearing in *Rose*).

The reasons for this overwhelming weight of judicial opinion are manifest. Since *Wooley v. Maynard*, 430 U.S. 705 (1977), it has been clear that messages on license plates implicate drivers' First Amendment rights. After all, "no one who sees a specialty plate imprinted with the phrase 'Choose Life' would doubt that the owner of that vehicle holds" a certain "viewpoint." *Rose*, 361 F.3d at 794. What is more, specialty plates like the ones in this case originate from private citizens or organizations, who must take special steps to gain approval for those plates, and who must pay additional fees to obtain one. Without the requisite number of private citizens willing pay a premium fee to communicate a particular message, no specialty plate will issue. As the Fourth Circuit reasoned, "[i]f the General Assembly intends to speak, it is curious that it requires the guaranteed collection of a designated amount of money from private persons before its 'speech' is triggered." *SCV*, 288 F.3d at 620.

Defendant makes no serious attempt to counter these points. Instead, he seizes on the fact that, following a plate's approval by the legislature, the State "work[s] with" the plate's sponsor on design, and theoretically retains ultimate authority to approve or reject a design, to contend that, "[w]hen government is in a position to exercise editorial judgment, * * * there is no First Amendment issue" for private citizens. Br. 5. As primary support for this proposition, he cites *Johanns v. Livestock Marketing Association*, 125 S. Ct. 2055 (2005), in which a beef producer alleged that the government violated his First Amendment rights by compelling him to pay a tax

that the government then used to propagate its own speech through advertising.[1] Defendant suggests that "there was no question the advertising campaign in *Johanns* was government speech because the Secretary of Agriculture had final approval authority over every word in every promotional campaign" (Br. 5), and argues that the same result should obtain here since the State theoretically has the power to veto a specialty plate design.

Defendant's theory is wrong at every turn. *First*, as a factual matter, it is simply untrue that the government exercises meaningful editorial oversight over Illinois specialty plates. In *SCV*, the Virginia statute gave the DMV Commissioner broad discretion to approve or reject plates, but the Fourth Circuit observed that "little, if any, control [was] ordinarily exercised." 288 F.3d at 620-21. The same is true in Illinois. With few exceptions – mostly relating to the inclusion of the phrase "Land of Lincoln" – the statutes passed by the Illinois General Assembly have left design decisions to the Secretary's discretion. SUF ¶ 30. The Secretary acknowledges that the sponsoring organization "exercise[s] some editorial control" over plate design (Mot. Dis. 12), and the evidence suggests that the Secretary's role is essentially limited to providing a graphic artist, and ensuring that law enforcement agrees that proposed designs are sufficiently visible. SUF ¶ 21, 28; Mot. to Dismiss at 12. Tellingly, there is no evidence that the Secretary has *ever* rejected a specialty plate design provided by an organization. SUF ¶ 28.

*Second*, even if Illinois did exercise meaningful oversight of specialty plate design, *Johanns* does *not* hold that such oversight precludes the presence of private speech. Although the government's editorial control of the advertisements in *Johanns* was considered relevant to whether the advertisements contained governmental speech, the *dispositive* factor was that "[t]he

---

[1] Defendant also cites *Arkansas Educational Television Comm'n v. Forbes*, 523 U.S. 666 (1998), for the proposition that there is no First Amendment violation when a state-owned television station exercises its editorial judgment in "deciding which candidates meet a minimum level of support in the polls to participate in a televised debate," and thereby excludes some candidates. Br. 5. We agree – the First Amendment does not prohibit the Secretary from rejecting any application that fails to show sufficient popularity by specifying a minimum number of signatures that must be obtained from prospective plate purchasers. Indeed, the Secretary may choose whatever number of signatures he likes, so long as that number applies across the board. What he cannot do is require a certain number of signatures, then reject an application that meets that level, as he has done with Choose Life, because of the speaker's viewpoint. That would be like excluding the most popular candidate from a debate simply because the government disapproves of his views on *Roe v. Wade*, something the *Forbes* Court certainly did not condone.

-4-

message set out in the beef promotions is from beginning to end the message established by the Federal Government." *Johanns*, 125 S. Ct. at 2062. Congress directed the creation of a "coordinated program" of promotion, "including paid advertising, to advance the image and desirability of beef products." *Ibid.* It also specified what the promotions must contain (certain types of beef products), and what they could not (particular brand names or trade names). *Id.* at 2063. The Court concluded that "[w]hen * * * the government sets the overall message to be communicated *and* approves every word that is disseminated," it is not precluded from offering a government-speech defense merely because it solicits private assistance in developing its specific messages. *Ibid.* (emphasis added). Here, it would be absurd to suggest that the "Choose Life" message originated with the government – quite the opposite, it was proposed by private citizens, and in fact was required to be *sufficiently popular among private citizens* before the issuance of a new plate became possible. The government is trying to suppress – not sponsor – the Choose Life message.

## III. WHERE THE GOVERNMENT VOLUNTARILY OPENS A FORUM TO PRIVATE SPEECH, THE SIMULTANEOUS PRESENCE OF GOVERNMENTAL SPEECH CANNOT JUSTIFY CONTENT- OR VIEWPOINT-BASED DISCRIMINATION

A surprisingly large portion of the Secretary's brief (at 2-6) is spent asserting and defending the uncontested idea that the government "may advocate for one side on a public debate," and that, "[w]hen it does so, it is under no obligation to issue counter-messages as well." *Id.* at 2. Plaintiffs have never argued otherwise; indeed, from our perspective, it would be perfectly legal for the State of Illinois to run advertisements saying "Support Adoption." Were it to do so, the State would not also be required to promulgate an anti-adoption message. The plain reason is that such a communication is pure governmental speech – even if it takes a side on an issue that is being debated publicly. The analysis changes radically, however, where – as here – the government opens a forum to any *private* speech that garners a certain amount of support, then allows only those private expressions with which it agrees. The former step is espousing its own view in a public debate; the latter is suppressing a private view with which it disagrees, the paradigmatic example of conduct that violates the First Amendment.

The Secretary attempts to escape the force of this logic by resort to false analogy. Noting

that the Court in *Wooley* held that a State could not force a driver to use his car as a "mobile billboard" for the State's message (430 U.S. at 714), he suggests that, conversely, "the State has an equal right not to be compelled to issue plates with messages it may disagree with." Br. 7. There are at least two fatal flaws in his reasoning. *First*, the First Amendment only protects citizens from *state action*, not states from private action. *Second*, in this setting, *the government itself* (according to Defendant) *has chosen to speak*, and to do so for any specialty plate application that demonstrates sufficient popularity. Because the government has chosen to speak and to allow private individuals to speak in the specialty plate forum, it cannot discriminate based on the viewpoints that the private speakers would offer. See *Rose*, 361 F.3d at 796 ("[B]ecause the State has established a license plate forum for the abortion debate, it cannot limit the viewpoints expressed in that forum."); *SCV*, 305 F.3d at 247 (Luttig, J., opinion respecting rehearing) ("[W]here the government has voluntarily opened up for private expression property that the individual is actually required by the government to display publicly," "the private speech component of the particular communication is significant," and "the government's interest in its speech component is less than compelling," the government is "forbidden from engaging in viewpoint discrimination among the various private speakers who avail themselves of the government's offer."). See generally Plaintiffs' Mot. 8-10.

## IV.  THE INDIVIDUAL PLAINTIFFS HAVE STANDING

The plaintiffs in this case are Choose Life Illinois, a nonprofit entity, as well as 15 individuals who are unable to purchase Choose Life plates due to the Secretary's unconstitutional conduct. The Secretary contends that the individual plaintiffs should be dismissed from the case for lack of standing, on the ground that "the applicant for the Choose Life plate is the organization, not the individual motorists." Br. 11. The argument is incorrect.

As the Secretary correctly notes, Article III standing requires three showings: that (1) the party must have personally suffered an actual or threatened injury caused by defendant's conduct; (2) the injury must be fairly traceable to the challenged conduct; and (3) the injury must be one that is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992). The individual plaintiffs -- who aver that the Secretary's viewpoint discrimination has denied them the ability to purchase Choose Life specialty plates for their cars

-6-

– plainly satisfy all three tests. *First*, they have been actually injured by the Secretary's conduct, because, but for his discrimination, they would now own Choose Life plates. *Second*, their inability to purchase plates is directly traceable to the challenged decision not to issue those plates. *Finally*, their inability to purchase Choose Life plates would obviously be redressed by a favorable decision.

Nevertheless, the Secretary contends that "the applicant for the Choose Life plate is the organization, not the individual motorists," and that "[t]he individuals cannot assert the rights of a third party, in this case Choose Life Illinois." Br. 11. Not so. The individuals are not asserting the right of Choose Life Illinois to have its application approved, but rather are asserting *their own right* to purchase and display the Choose Life plate, which has satisfied all of the statutory criteria for issuance.[2] Indeed, it is passing strange that the Secretary would allege that the individual plaintiffs have no interest in the litigation when both the statutory framework (625 ILCS 5/3-600(a)) and the Secretary's own "Fact Sheet" *require* that individuals demonstrate their concrete interest in the application's success by stating their intent to purchase a plate.

*Women's Resource Network* v. *Gourley*, 305 F. Supp. 2d 1145 (E.D. Cal. 2004), is not to the contrary.[3] As the Secretary himself points out, in that case, the California specialty plate statute "d[id] not provide the individual plaintiffs with a speech forum since it [was] only open to nonprofit organizations." Br. 11 (quoting *WRN*, 305 F. Supp. 2d at 1150). The same is not true in Illinois – nothing prevents individuals, for-profit groups, or any other entities from applying for specialty plates. The mere fact that the individuals in this case – all of whom are members of Choose Life Illinois – chose to apply for plates through the group is immaterial. In fact, it is difficult to imagine any other manner in which they could have proceeded: surely the Secretary

---

[2] Likewise, Choose Life Illinois is asserting its own rights, not those of the individual plaintiffs. Indeed, unlike any individual plaintiff, Choose Life stands to gain revenue if the application succeeds. This is not an associational standing case.

[3] The Secretary dramatically understates the matter when he notes that *WRN* "differs in some respects on the merits from the position [he] has taken." In fact, that case squarely rejects his theory that the government has unbridled editorial discretion to exclude disfavored views from the specialty plate forum. See *WRN*, 305 F. Supp. 2d at 1152-53 ("[T]he First Amendment requires that California establish neutral criteria to insure that the plate licensing decision is not based on the content or viewpoint of the speech being considered.").

(to say nothing of the General Assembly) would prefer that the 25,000 individuals who are interested in Choose Life plates consolidate their applications into one effort, rather than each filing his own application and waging his own lobbying campaign (presumably after collecting 850 signatures of other applicants). What is more, the underlying principle in *WRN* – that only the first applicant has standing to challenge a denial of that application – makes little sense in light of the fact that each individual applicant has a personal stake in obtaining the specialty plate. In short, the way the individual plaintiffs have proceeded is reasonable, and their efforts to streamline the approval process would be a truly perverse justification for dismissing them from the litigation.

Finally, there is little to the Secretary's half-hearted suggestion that plaintiffs lack standing to pursue their alternative remedy of enjoining the specialty plate program because doing so "would not further [their] First Amendment rights." Br. 12. That argument misapprehends plaintiffs' position: the relief they seek is to end the Secretary's current practice of viewpoint discrimination, either by compelling him to issue a Choose Life plate (their preferred solution); by enjoining the Secretary's regulation, so that approval happens when the statutory requirements are met; or by enjoining the issuance of other plates pursuant to the current, unconstitutional scheme (their alternative remedies). Any of these avenues of recourse would end the discrimination of which they complain, because each would place them on equal footing with groups that offer messages more to the Secretary's liking. Plaintiffs' position here is thus unlike the one examined in *Henderson v. Stalder*, 287 F.3d 374, 381 (5th Cir. 2002), vacated, 46 Fed. Appx. 213 (2003), where plaintiff complained only that "she had been denied the opportunity to express her pro-choice point of view."

## V. THIS COURT HAS JURISDICTION TO ENJOIN THE SPECIALTY PLATE PROGRAM

The primary remedy that plaintiffs seek is to compel the Secretary to cease his content- and viewpoint-based discrimination by issuing a Choose Life specialty plate. Only if that remedy is unavailable do they request that this Court enjoin the specialty plate program in its current discriminatory form. Nevertheless, the Secretary suggests that the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341, deprives this Court of jurisdiction to enjoin the program because doing so

would prevent the collection of taxes paid by specialty plate purchasers.[4] That contention is incorrect, because the specialty plate assessments are properly considered fees, not taxes.

The TIA states that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy, or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." Thus, by its express terms, the TIA prevents only judicial orders that would restrain the collection of *taxes*, and myriad cases make clear that the term "tax" is meant in a very limited sense, *i.e.*, that the TIA does *not* apply to other forms of levies, such as user fees. See *Neinast v. Texas*, 217 F.3d 275, 278 (5th Cir. 2000) ("The applicability of the Act turns on whether the * * * charge is a 'tax' or instead a 'fee.'"); *San Juan Cellular Tel. Co. v. Public Serv. Comm'n*, 967 F.2d 683, 685 (1st Cir. 1992) (same). Distinguishing a tax from a fee is sometimes difficult, but federal appellate courts agree that "[t]he classic fee is imposed (1) by an agency, not the legislature; (2) upon those it regulates, not the community as a whole; and (3) for the purpose of defraying regulatory costs, not simply for general revenue-raising purposes." *Neinast*, 217 F.3d at 278. At least two of these factors, and possibly all three, suggest that the specialty plate assessments are properly considered fees.

*First*, the charges are imposed by the Secretary, not the General Assembly, which is characteristic of a fee. The Secretary notes that legislation passed by the General Assembly sets forth assessment schedules for some (but not all) specialty plates (Br. 14), but the legislature acts on specialty plate applications only because the Secretary has improperly delegated *his own authority* to it. As discussed above, the Illinois specialty plate statute (625 ILCS 5/3-600) contains no mention of fees. Indeed, to the extent it mentions financial considerations at all, it places the onus *on the Secretary* to ensure that plates will not issue unless "the number of applications * * * is sufficient to pay for the total cost of designing, manufacturing and issuing the special license plate." In other words, the statute makes the Secretary responsible for designing the application itself – which presumably establishes any application fee – and ensuring that enough applications are received to cover costs. The General Assembly has

---

[4] The Secretary does not argue that the Tax Injunction Act would foreclose an order compelling the issuance of a Choose Life plate, plaintiffs' primary requested remedy. Issuing the plate would likely *raise* revenue – it certainly would not reduce it – thereby falling into the exception to the TIA set forth in *Hibbs v. Winn*, 542 U.S. 88 (2004).

become involved in setting specific fees because the Secretary has delegated his authority, but his delegation does not change the fact that the authority to set fees is his by legislative design. The first *Neinast* factor thus suggests that the specialty plate assessments are fees, not taxes.

*Second*, there is no question but that the specialty plate assessments are imposed only on specialty plate purchasers, rather than the community as a whole. Because the charges impact only a narrow class of persons – those who have elected to take part in the scheme that the Secretary regulates – they are much more like user fees than taxes, which most often are broad-based.

*Finally*, the third factor – whether the charges are "for the purpose of defraying regulatory costs, [or] simply for general revenue-raising purposes," does not cut strongly in either direction. The Secretary correctly observes (Br. 14) that certain specialty plates require a charge beyond the base registration amount, and that such higher amounts are directed toward specific funds, be it the State Parks Fund or another fund that the specialty plate applicant selects. For example, if the Choose Life plate were approved, it is likely that amounts charged beyond the base fee would be funneled toward activities that promote adoption. However, the mere fact that specialty plates sometimes generate surplus revenue is not dispositive of the fee/tax issue. In *Marcus v. Kansas Dep't of Revenue*, 170 F.3d, 1305 1311-12 (10th Cir. 1999), for example, the money collected went into a special fund for the administration of the program, and excess funds at the end of the year were channeled into the state's highway fund. Despite the funds raised beyond mere administration costs, the Fifth Circuit nevertheless held that the charges were fees, because the amounts raised were "*primarily regulatory.*" *Neinast*, 217 F.3d at 278 (emphasis added).

The same is true here. To the extent that the Illinois specialty plate statute (625 ILCS 5/3-600) mentions funding at all, its concern is simply that the Secretary ensure that the program covers its own costs. Moreover, insofar as Illinois specialty plates generate revenue beyond administration costs, those funds do *not* go into general revenue, but rather they are earmarked for very specific purposes – the Parks Fund, or Wildlife funds – a characteristic of fees. Cf. *Hedgepath v. Tennessee*, 33 F. Supp. 2d 668, 671-73 (W.D. Tenn. 1998) (funds considered taxes where they went into highway fund, general fund, police pay supplemental fund, and trooper safety fund; no evidence of relationship to program itself). Thus, at least two of the three *Neinast*

factors suggest that the specialty plate charges are fees, not taxes.

*Henderson v. Stalder*, 407 F.3d 351 (5th Cir. 2005), upon which the Secretary relies, is not to the contrary. Although *Henderson* held that the TIA precluded federal courts from enjoining the Louisiana specialty plate program, that program differed from the Illinois program in material respects. Unlike the Illinois program, the Louisiana statutory scheme *required* legislative approval of each plate (*id.* at 355), meaning that the charges necessarily were imposed by the legislature, not the administrative agency, the first of the three *Neinast* factors discussed above. Moreover, the Louisiana scheme required that "[a]ll prestige plates * * * shall include a handling charge of three dollars and fifty cents to offset the administrative costs of the department for issuance of such plates." *Id.* at 355 n.3. No parallel requirement of general applicability exists in Illinois, making it much more difficult to draw a line between covering administrative costs, on the one hand, and raising revenue, on the other. Especially given the *Henderson* court's own observation that "reasonable minds can differ" on whether the charges at issue there were fees or taxes (*id.* at 354), these differences in the programs' structures are of critical importance.

Finally, it is worth noting that a narrowly tailored injunction – our preferred alternative remedy – could actually *raise* state revenue, thereby bringing the matter within the TIA exception outlined in *Hibbs v. Winn*, 542 U.S. 88 (2004). Plaintiffs' complaint is with the program structure established by the Secretary's "Fact Sheet," whereby he abdicates his responsibilities under the specialty plate statute by delegating to the General Assembly and Governor the task of approving new plates. The specialty plate statute itself merely requires that applicants obtain a certain number of signatures. Were this Court to enjoin only the Secretary's requirement that applicants seek legislative approval, the sole remaining requirement would be a set number of signatures, meaning that applications like Choose Life's – which garnered approximately 25,000 signatures – would be easily approved, which again would *raise* overall revenue.

## VI.  THE SECRETARY'S PARADE OF HORRORS IS MISGUIDED, UNLIKELY, AND  LARGELY AVOIDABLE

Finally, the Secretary worries that, if plaintiffs successfully compel him to issue a Choose Life plate, "[t]he State of Illinois would have to issue Ku Klux Klan or Nazi plates on the theory

the license plate is a 'public forum' like a public park." Br. 7. In so arguing, the Secretary confirms that he considers it desirable – indeed, necessary – to discriminate based on the message and perspective an applicant would convey, which is *precisely* the judgment the First Amendment precludes the government from making. As we explained in our Motion for Summary Judgment (at 13), other courts have concluded that the Secretary's concern is entirely insufficient to survive strict scrutiny. See *Lewis* v. *Wilson*, 253 F.3d 1077 (8th Cir. 2001) (holding unconstitutional Missouri's refusal to reissue the vanity plate "ARYAN-1").

Realistically, however, it is unlikely that the Illinois specialty plate program would ever devolve into the anarchy that the Secretary imagines. For one thing, it is perfectly legal for the Secretary to reject any application for a plate that contains hate speech or obscenity, neither of which is shielded by the First Amendment. See *Perry* v. *McDonald*, 280 F.3d 159 (2d Cir. 2001) (rejecting challenge to denial of "SHTHPNS" vanity plate). Moreover, it is unlikely that true extremist groups would achieve the number of commitments necessary to obtain a specialty plate; after all, so far as we know, no such group has ever applied, which makes sense given that members of such groups are often loathe to advertise their status. Nonetheless, if the Secretary is truly concerned about the specter of specialty plates conveying messages to which the government objects, he is free to raise the required number of signatures to make the application process more difficult. Because the signature requirement is universal, it is nondiscriminatory and therefore constitutional, regardless of the level at which it is set.

Finally, the Secretary's "damned if we do, and damned if we don't" lament about possible future litigation is a sheep in wolf's clothing. He suggests that, if the State "approves the 'Choose Life' plate, it could find itself in litigation by those opposing the message," as in *Planned Parenthood* v. *Rose*, 361 F.3d 786 (4th Cir. 2003), or *ACLU* v. *Bredesen*, 354 F. Supp. 2d 770 (M.D. Tenn. 2004). Br. 10. But if it doesn't approve the plate, he continues, "it finds itself in a case like this one." *Ibid.* The Secretary reasons that "the only way out of the dilemma [is to hold] that the State, as a 'speaker' in the plate's creation and design, can make content-based choices free of the First Amendment restrictions applicable to private speech." *Ibid.* But that is simply untrue. Although the Secretary is right that the State "could find itself in litigation" in the future if it issues the Choose Life plate, he is correct only in the superficial

sense that *any* State decision *could* give rise to litigation. But it is another matter entirely to suggest that issuing the Choose Life plate would actually subject the State to liability along the *Rose* or *Bredesen* lines. It certainly would not.

In *Rose*, two state legislators *acted on their own initiative* to authorize a Choose Life plate, and they *rejected* Planned Parenthood's appeal for a pro-choice plate. 354 F.2d at 788-89. Similarly, in *Bredesen*, 354 F. Supp. 2d at 772, the state legislature approved a Choose Life plate but *rejected* a pro-choice plate. Neither case would support liability merely for approving a Choose Life plate, unless at the same time the State rejected a qualified application for a plate offering a different perspective on that issue. If a group advocating "Choose Choice" gathers the requisite number of signatures in Illinois – and we know of no effort to do so to date – the State may avoid liability simply by treating that application like any other. Plaintiffs in this case would have no objection to the State approving such a plate.

## CONCLUSION

For the reasons stated above, this Court should deny Defendant's motion for summary judgment.

December 7, 2005

Respectfully submitted,

/s/ Thomas Brejcha
Thomas Brejcha
Christopher Henning
THOMAS MORE SOCIETY
29 South LaSalle Street, Suite 440
Chicago, IL 60603
Tel.:(312) 782-1680
Fax: (312) 782-1887

Alan Unterciner
Damon Taaffe
ROBBINS, RUSSELL, ENGLERT,
　ORSECK & UNTEREINER LLP
1801 K Street, N.W., Ste. 411
Washington, D.C. 20006
Tel.: (202) 775-4500
Fax: (202) 775-4510

*Attorneys for Plaintiff Choose Life, Inc., et al.*